IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JENNIFER GRAHAM, | : |
| | : |
| Plaintiff, | : |
| | : Case No. 2:24-cv-1524 |
| v. | : |
| | : Judge Algenon L. Marbley |
| PLANNED PARENTHOOD OF | : Magistrate Judge Chelsey M. Vascura |
| GREATER OHIO, | : |
| | : |
| Defendant. | : |

## OPINION & ORDER

This matter is before the Court on Defendant's Motion to Dismiss (ECF No. 23). For the reasons stated below, the Motion is **GRANTED in part and DENIED in part**. The Motion is denied as to Counts IV and IX and granted as to Count XIII. Accordingly, Count XIII is **DISMISSED**.

### I.  BACKGROUND

Plaintiff Jennifer Graham is a former employee of Defendant Planned Parenthood of Greater Ohio ("PPGOH"). (ECF No. 21 ¶¶ 1, 11, 23). On April 2, 2024, Plaintiff brought this action alleging reverse race discrimination and retaliation against PPGOH. (ECF No. 1 ¶ 1).

#### A.  Position During Employment

Plaintiff, a White woman, is a Certified Nurse Practitioner ("CNP") who was hired by PPGOH on May 28, 2018. (ECF No. 21 ¶ 28). She worked in PPGOH's surgery centers and family planning clinics, and trained nurses, healthcare assistants, licensed nurse practitioners, and students. (*Id*. ¶ 27).

Plaintiff alleges that, around August 2022, the President of PPGOH detailed a new strategic plan to develop a Black Staff Equity Program. (*Id*. ¶ 33). She asserts that while she praised and

supported the initiative, she also "noted that diverse employees who were neither African American nor white would not benefit from this program." According to Plaintiff, her concerns were ignored. (*Id*.).

In June 2022, Plaintiff alleges that the Director of Nursing recommended her for a promotion, and that PPGOH considered her both a top candidate and the only qualified candidate for the position. (*Id*. ¶ 34). On or about September 23, 2022, Plaintiff's supervisor encouraged her to apply for either the Director of Nursing position or the Director of Care Coordinator position. (*Id*. ¶ 67). She was allegedly informed that she was the only CNP qualified for the Director of Nursing role. As such, she applied and received repeated feedback from multiple supervisors that she was the best candidate for the position. (*Id*. ¶¶ 68–69).

### B. Injury and FMLA Leave

Plaintiff also claims that she fell and injured her ankle during a break at work, resulting in multiple fractures and torn ligaments in her foot. (*Id*. ¶¶ 35–36). She was placed on medical leave until June 22, 2022. Upon her return to work, she was medically restricted to a part-time schedule and limited mobility for an indefinite period. (*Id*. ¶¶ 36–37).

Plaintiff alleges that PPGOH required her to exceed those medical limitations by requiring frequent standing and walking as well as a full-time schedule. As a result, she had to purchase a knee roller to perform her duties. (*Id*. ¶ 38). She also alleges that in October 2022, she was advised that she would need surgery and that she would be unable to walk for around two months thereafter. (*Id*. ¶ 39). She submitted a request for FMLA leave from the date of the surgery— November 22, 2022—through January 3, 2023. (*Id*. ¶ 40). Her supervisor allegedly questioned the amount of leave requested and expressed frustration about her unavailability to train new employees and

2

stating, "that really changes things." (*Id*. ¶ 41). PPGOH approved her leave on October 31, 2022. (*Id*. ¶ 42).

### C. Complaints at Work

In June 2022, PPGOH hired Brianna Frazier, an African American woman, as a healthcare assistant. Plaintiff alleges that Frazier committed various work errors. (*Id*. ¶ 3). According to Plaintiff, she and other diverse employees brought these errors to Frazier's attention, but Frazier "responded with open hostility and made no changes in her behavior." (*Id*. ¶ 4). On behalf of the entire staff, Plaintiff and her supervisor raised their concerns to PPGOH's Practice Manager both informally and through formal reporting measures. (*Id*.). Frazier was eventually removed from the workflow and assigned to additional training. (*Id*. ¶ 5). Plaintiff alleges that, in response, Frazier confronted her "aggressively" and made false accusations in retaliation. (*Id*.). Plaintiff then submitted a complaint to PPGOH's Vice President of Human Resources ("VP of HR"), who is also an African American woman, detailing Frazier's alleged performance issues and retaliatory behavior. (*Id*.).

The complaints were referred to PPGOH's Diversity, Equity, and Inclusion Officer ("DEI Officer"), also an African American woman, for investigation. (*Id*. ¶ 6). Plaintiff alleges that during their initial conversation, the DEI Officer "was aggressive and unprofessional," "dismissed Graham's claims of Frazier's performance deficiencies," and "neglected to even interview any other staff or review the supporting medical records." She further claims that the DEI Officer "was openly confrontational" and accused Plaintiff of making false claims against Frazier. (*Id*.).

Plaintiff later reviewed the DEI Officer's social media account and found posts that she alleges were "racist and evidenced a discriminatory animus toward white people." (*Id*. ¶ 7). She reported this conduct to the VP of HR, who then took over the investigation of Plaintiff's

3

complaint. (*Id*.). Plaintiff, however, alleges that the investigation relied entirely on the DEI Officer's prior conclusions and that her own complaint was dismissed without independent review. She also claims that the VP of HR never investigated her complaint against the DEI Officer. (*Id*.).

In or around September 2022, Plaintiff alleges that a staff meeting took place with Frazier to address her performance issues, during which Frazier again acted "hostile and unreceptive to feedback." (*Id*. ¶ 8). Plaintiff met with the VP of HR to discuss both Frazier's performance issues and her own potential promotion to Director of Nursing. (*Id*. ¶ 9). Plaintiff asserts that rather than discussing these topics, she was "ambushed" with "false accusations of unprofessional conduct" and was informed she would not be promoted "despite being the only qualified candidate." (*Id*.). She also alleges that the VP of HR claimed to be unaware of Frazier's performance deficiencies and asked Plaintiff to document them, despite Plaintiff's claim that she had been submitting such complaints for months. (*Id*.). Plaintiff then documented and submitted reports evidencing continued performance deficiencies through PPGOH's database. When those complaints were not addressed, Plaintiff escalated her concerns to the VP of HR's supervisor. (*Id*. ¶ 10).

On November 18, 2022, just four days after she escalated her complaints and four days before her FMLA leave was set to begin, Plaintiff was terminated. (*Id*. ¶¶ 11, 80, 82). PPGOH claimed that her reports against Frazier "were retaliatory in nature and violated its 'zero-tolerance' policy prohibiting retaliation." (*Id*. ¶¶ 11, 80).

### D. Administrative Remedies

On May 16, 2023, Plaintiff filed a Charge of Discrimination against PPGOH with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC"). (ECF No. 23-1). Within the EEOC Charge, the section titled "Discrimination Based On" reflects that Plaintiff checked the boxes for "race," "retaliation," and "other," while notably

4

leaving the "disability" box unmarked. (*Id.*). In the section designated for detailing the "particulars" of the charge, Plaintiff included 37 numbered paragraphs, which largely mirror the factual allegations set forth in the Complaint. (*Id.*). These details include the issues involving Frazier, both formal and informal complaints related to those issues, interactions with the DEI Officer, and reports made to the VP of HR. Plaintiff also alleged retaliation based on her exercise of FMLA leave, including a description of her work-related injury, the allegedly hostile response to her FMLA request, and her termination occurring just four days before her scheduled leave. (*Id.*). The EEOC subsequently dismissed the charge and issued a Notice of Right to Sue on January 4, 2024. (ECF No. 21, Ex. A).

On April 2, 2024, Plaintiff initiated this lawsuit against PPGOH, asserting claims for: "(1) reverse race discrimination in violation of Ohio and federal law; (2) disability discrimination in violation of Ohio and federal law; (3) retaliation in violation of Ohio and federal law; and (4) interference in violation of the FMLA." (ECF No. 1 ¶ 13). In response, PPGOH filed a partial motion to dismiss, arguing that Plaintiff failed to exhaust administrative remedies with respect to her disability discrimination claim and her retaliation claim related to requesting a reasonable accommodation. (ECF No. 7).

Shortly before PPGOH filed its motion, on June 19, 2024, Plaintiff submitted a second Charge of Discrimination with the EEOC and OCRC. (ECF No. 23-2). In this charge, Plaintiff specifically alleged disability discrimination and retaliation related to her termination and the denial of a reasonable accommodation. (*Id.*). She asserted her belief that PPGOH denied her a reasonable accommodation for her disability and subsequently terminated her employment either because of her disability or in retaliation for her request. (*Id.*). On September 12, 2024, the OCRC issued its Letter of Determination notifying Plaintiff that she exhausted her administrative

5

remedies with respect to her state law disability claims set forth in Counts V and X. (ECF No. 21, Ex. B).

On September 24, 2024, Plaintiff filed an Amended Complaint to reflect the exhaustion of administrative remedies. (ECF No. 21). The Amended Complaint asserts thirteen causes of action, including: (1) race discrimination in violation of 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981, and Ohio Rev. Code § 4112.02(B); (2) disability discrimination in violation of 42 U.S.C. §§ 12111, et seq., and Ohio Rev. Code § 4112.02(B); (3) retaliation in violation of 42 U.S.C. §§ 2000e, et seq., 42 U.S.C. §§ 1981-82, and Ohio Rev. Code § 4112.02(I); (4) retaliation for requesting a reasonable accommodation in violation of 42 U.S.C. § 12203 and Ohio Rev. Code § 4112.02(I); (5) interference with entitlement to leave under the Family and Medical Leave Act ("FMLA") in violation of 29 U.S.C. § 2615(a)(1); (6) retaliation in violation of the FMLA 29 U.S.C. § 2615(a)(2); and (7) retaliation in violation of public policy ensuring patient safety. (ECF No. 21).

PPGOH now moves to dismiss, with prejudice, three specific claims: the disability discrimination and retaliation claims under the Americans with Disabilities Act ("ADA") (Counts IV and IX); and the claim for retaliation in violation of public policy ensuring patient safety (Count XIII). (ECF No. 23). PPGOH argues that Counts IV and IX must be dismissed because Plaintiff failed to exhaust her administrative remedies under the ADA. It also moves to dismiss Count XIII, asserting that the claim is improperly based on inapplicable premises liability statutes and fails to state a cognizable claim under Ohio law. (ECF No. 23).

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). For purposes of this motion to dismiss, the

6

Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) (internal quotations omitted).

To survive a motion to dismiss, "the plaintiff must allege facts that, if accepted as true, are sufficient to raise a right to relief above the speculative level and to state a claim to relief that is plausible on its face." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) (internal quotations omitted). A claim is considered plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). And though the court "must accept all well-pleaded factual allegations in the complaint as true," the court "need not accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted).

In assessing a Rule 12(b)(6) motion to dismiss, the court's primary focus will be on the allegations in the complaint. The court may also consider "any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

### III. LAW & ANALYSIS

#### A. Exhaustion of Administrative Remedies for ADA claims (Counts IV and XI)

A plaintiff bringing employment discrimination claims under the ADA must first exhaust administrative remedies. *Jones v. Nat. Essentials, Inc.*, 740 F. App'x 489, 492 (6th Cir. 2018). This requirement is a condition precedent, so failure to exhaust administrative remedies properly

constitutes a valid basis for dismissal. *Id*. "To properly exhaust administrative remedies under the ADA, a plaintiff must file a charge of discrimination with the EEOC within 300 days of the alleged discrimination." *Id*. (citing *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 309 (6th Cir. 2000); 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e–5(e)(1)). The plaintiff must then obtain a right-to-sue letter from the EEOC before initiating a lawsuit. *Jones*, 740 F. App'x at 492–93.

PPGOH argues that Plaintiff failed to satisfy the exhaustion requirement for her ADA claims. PPGOH notes that while Plaintiff filed an EEOC charge explicitly referencing disability discrimination in June 2024, that charge was untimely, as it was submitted well beyond the 300-day deadline for allegations arising between June and October 2022. Consequently, Plaintiff must rely on her earlier, timely filed EEOC charge to satisfy the exhaustion requirement. PPGOH argues, however, that the timely filed charge fails to reference a disability or otherwise provide notice of an ADA claim. (ECF Nos. 23 at 3; 25 at 1).

As a general rule, a plaintiff may not pursue claims in a judicial proceeding that were not first raised in the EEOC charge. *See Jones v. Sumser Ret. Vill.*, 209 F.3d 851, 853 (6th Cir. 2000). That said, the "omission of a formal allegation in the EEOC filing is not always a fatal mistake." *Woodling v. GeoBuild, LLC*, No. 22-3499, 2023 WL 335283, at *2 (6th Cir. Jan. 20, 2023). The Sixth Circuit has held that a failure to include an explicit allegation in an EEOC charge does not automatically foreclose judicial review, provided the claim is reasonably within the scope of the agency's expected investigation. *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004).

To satisfy the exhaustion requirement, the EEOC charge must be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010) (quoting 29 C.F.R. § 1601.12(b)). In assessing sufficiency, courts construe charges liberally, allowing plaintiffs to raise "claims that are

8

reasonably related to, or that grow out of, the factual allegations in the charge." *Id*. at 362. The judicial complaint is thus not strictly limited to the claims explicitly stated in the EEOC charge, but to those claims that are within "the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 380 (6th Cir. 2002); *Dixon*, 392 F.3d at 217. When the facts alleged in the EEOC charge would reasonably prompt the agency to investigate a different, uncharged basis for discrimination, the plaintiff is not barred from pursuing that claim in court. *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir. 1998).

In her timely filed EEOC charge, Plaintiff did not check the box for "disability" in the section identifying the basis for discrimination. (ECF No. 23-1, Ex. A). She did, however, describe her ankle injury, the need for surgery, her inability to work, her request for FMLA leave, and the retaliation and termination that followed. Plaintiff stated:

> In addition to suffering discrimination in the workplace, I was also retaliated against for my exercise of FMLA leave. On June 9, 2022, I injured my ankle at work, requiring surgery. My doctor advised me that I would not be able to work for a period following the surgery. As such, I requested FMLA from November 22, 2022, through January 3, 2023. On October 31, 2022, Human Resources approved the request and forwarded it to Ms. Dzuban and Ms. Shanks.
>
> Soon after submitting my request for FMLA, I was met with hostility at work. Ms. Shanks, the Lead Clinician and my boss, outwardly expressed her displeasure in a text message when she learned that I would be taking FMLA because I would not be able to train one of the new hires. Planned Parenthood's retaliation against me for requesting FMLA leave is best evidenced by my termination four days before I was to exercise my leave.

(*Id*. ¶¶ 33–34). Thus, although Plaintiff did not check the "disability" box, the substance of the factual narrative, not the labels used, will be determinative for exhaustion purposes.

Plaintiff asserts that the description of her ankle injury sufficiently alleges an impairment that substantially limited major life activities, including walking, standing, lifting, and working—bringing it within the ADA's definition of a disability. (ECF No. 24 at 9–10). She also contends

9

that the same injury qualified both as a "serious health condition" under the FMLA and a "disability" under the ADA. (*Id*. at 10).

There is no dispute that the EEOC charge implicates the FMLA and the "serious health condition" standard. (ECF Nos. 23 at 7–8; 24 at 9; 25 at 3). Under the FMLA, a "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition" involving "inpatient care in a hospital, hospice, or residential medical care facility" or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

While the parties agree that a condition qualifying as a "serious health condition" under the FMLA may also qualify as a "disability" under the ADA, they disagree as to whether Plaintiff's EEOC charge provided adequate notice of the latter. (ECF Nos. 23 at 8; 24 at 10; 25 at 3). Under the ADA, "disability" means "a physical or mental impairment that substantially limits one or more major life activities of such individual . . . ." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

PPGOH correctly notes that not all serious health conditions under the FMLA qualify as disabilities under the ADA. (ECF Nos. 23 at 8; 25 at 3). PPGOH also argues that the charge was prepared by counsel and clearly articulated claims of race discrimination, retaliation, and FMLA violations. (ECF No. 25 at 4). They thus contend that if Plaintiff intended to assert a disability discrimination claim, she could have done so and was fully capable of including it in the charge. (*Id*.).

Although that argument has some merit, the relevant inquiry is not whether the charge used a specific legal term like "disability" or described the claim with the same detail as other claims.

10

Rather, the question is whether the facts alleged in the EEOC charge were sufficient to provide notice of a potential disability claim. *See Younis*, 610 F.3d at 362.

PPGOH's emphasis on Plaintiff's representation by counsel is also unavailing. While courts may afford *pro se* litigants some leniency, the Sixth Circuit has made clear that "the fact that we liberally construe EEOC charges filed by *pro se* complainants 'does not mean that a broad reading may not, or should not, be given in cases where a plaintiff has counsel.'" *Spengler v. Worthington Cylinders*, 615 F.3d 481, 490 (6th Cir. 2010).

Consistent with *Spengler*, district courts have applied this liberal construction standard to charges even where the complainant was represented by counsel. *See, e.g.*, *Dunn v. Chattanooga Pub. Co.*, 993 F. Supp. 2d 830, 841 (E.D. Tenn. 2014) (liberally construing charges drafted with the assistance of counsel); *Szeinbach v. Ohio State Univ.*, 987 F. Supp. 2d 732, 749 (S.D. Ohio 2013) ("I conclude that a charge filed by a plaintiff who is represented by counsel should be liberally read.").

Plaintiff described in her EEOC charge a significant workplace injury that required surgery and a multi-week leave of absence. She alleged that PPGOH was aware of the need for the FMLA to address the injury, yet she received hostile responses and was eventually terminated. Given the nature of the injury and its impact on her ability to work, the factual narrative in the charge could reasonably have prompted an investigation into disability-related claims. *See Davis*, 157 F.3d at 463. While Plaintiff did not invoke the terms "disability" or "accommodation" in the EEOC charge, the underlying facts, particularly the extended work limitations and the employer's hostile

11

response, are sufficient to trigger investigation into whether the condition qualified as a disability under the ADA.

Applying the liberal construction standard, this Court finds that Plaintiff's timely filed EEOC charge is sufficiently precise to encompass her ADA claims. Accordingly, those claims are not barred for failure to exhaust administrative remedies.

### B. Wrongful Termination in Violation of Public Policy (Count XIII)

PPGOH also urges this Court to dismiss Count XIII—Plaintiff's claim that PPGOH wrongfully terminated her employment in violation of Ohio's public policy promoting workplace and patient safety. (ECF No. 23 at 10). Plaintiff bases this claim on Ohio Rev. Code §§ 4101.11 and 4101.12. PPGOH argues dismissal is warranted because those statutes pertain to premises liability and do not apply to patient care concerns unrelated to PPGOH's premises.

To state a claim for wrongful termination in violation of public policy, a plaintiff must establish, *inter alia*, that "a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law"—a requirement often called the "clarity element." *Bender v. Champlain Enters., LLC*, 797 F. App'x 1008, 1013 (6th Cir. 2020) (quoting *Collins v. Rizkana*, 73 Ohio St.3d 65, 652 N.E.2d 653, 657–58 (1995)).[1]

---

[1] The Sixth Circuit summarized the governing law as follows:
> Ohio law provides that an at-will employee . . . generally has no guarantee of continued employment. *See Dohme v. Eurand Am., Inc.*, 130 Ohio St.3d 168, 956 N.E.2d 825, 828–29 (2011). There is, however, a "public policy" exception to the employment-at-will doctrine. *Id.* at 829. To establish a claim for wrongful termination in violation of Ohio public policy, a plaintiff must show: (1) that "a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element)"; (2) that dismissal "under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element)"; (3) that "the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element)"; and (4) lack of an "overriding legitimate business justification for the dismissal (the overriding justification element)." *Collins v. Rizkana*, 73 Ohio St.3d 65, 652 N.E.2d 653, 657–58 (1995) (emphases omitted). The clarity and jeopardy elements present questions of law, while the causation and overriding justification elements present questions of fact.

*Bender*, 797 F. App'x at 1013.

## A. The Public Policy: R.C. §§ 4101.11 and 4101.12

In *Pytlinski v. Brocar Products, Inc.*, the Ohio Supreme Court recognized that "Ohio public policy favoring workplace safety is an independent basis upon which a cause of action for wrongful discharge in violation of public policy may be prosecuted." 94 Ohio St.3d 77, 760 N.E.2d 385, 388 (2002). The court later clarified in *Dohme v. Eurand Am., Inc.*, that, "to satisfy the clarity element of a claim of wrongful discharge in violation of public policy, a terminated employee must articulate a clear public policy by citation of specific provisions in the federal or state constitution, federal or state statutes, administrative rules and regulations, or common law." 130 Ohio St.3d 168, 956 N.E.2d 825, 831 (2011).

Plaintiff identifies Ohio Rev. Code §§ 4101.11 and 4101.12 as the sources of public policy supporting her claim. These statutes generally impose duties on employers to maintain safe workplaces for employees and frequenters.

It is asserted that these sections "manifest a clear public policy requiring healthcare providers to ensure patient safety." (ECF No. 21 ¶ 250). Section 4101.11 provides that:

> Every employer shall furnish employment which is safe for the employees engaged therein, shall furnish a place of employment which shall be safe for the employees therein and for frequenters thereof, shall furnish and use safety devices and safeguards, shall adopt and use methods and processes, follow and obey orders, and prescribe hours of labor reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters.

R.C. § 4101.11. On the other hand, § 4101.12 provides that:

> No employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe. No employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters. No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe.

R.C. § 4101.12.

Plaintiff alleges she engaged in protected activity by reporting Frazier's job performance deficiencies. She also reported "violations of PPGOH's policies and standards of conduct related to patient care." (*Id*. ¶ 251). The alleged violations include "serious omissions, deficiencies, and inaccuracies in Frazier's documentation." (*Id*. ¶ 3). These reported errors are said to have placed PPGOH's patients at risk. They also "potentially violated the Health Insurance Portability and Accountability Act of 1966 ("HIPAA"), jeopardized the licenses of the CNPs working with her and exposed PPGOH to liability." (*Id*. ¶ 3).

### B. The Clarity Element

There is, however, a well-recognized split among Ohio courts—and federal courts applying Ohio law—regarding whether §§ 4101.11 and 4101.12 satisfy the clarity element of a public policy wrongful discharge claim. Some courts have found that these statutes articulate a sufficiently clear public policy favoring workplace safety. For example, the Tenth District Court of Appeals held that the two statutes "together establish that there exists a clear public policy . . . in Ohio favoring workplace safety for employees and frequenters." *Blackburn v. Am. Dental Ctrs.*, 22 N.E.3d 1149, 1158 (Ohio Ct. App. 2014).

Other courts, however, have taken a more restrictive view, concluding that the statutes are too "general and broad" to meet the clarity requirement. The Sixth District expressed this position in *Whitaker v. First Energy Nuclear Operating Co.*, holding that §§ 4101.11 and 4101.12 lack the specificity necessary to support a wrongful discharge claim. *Whitaker v. First Energy Nuclear Operating Co.*, No. OT-12-021, 2013 WL 4792860, at *6 (Ohio Ct. App. Sept. 6, 2013).

Federal district courts applying Ohio law have echoed this divergence. Some have followed *Whitaker* and found that, while these statutes reference workplace safety in a general sense, they

14

do not articulate a specific public policy with the clarity required to support a wrongful discharge claim. *Romero v. City of Middletown*, 479 F. Supp. 3d 660, 675 (S.D. Ohio 2020); *see also Wells v. Russ' Steamer Serv., LLC*, No. 3:23-CV-105, 2023 WL 5833101, at *4 (S.D. Ohio Sept. 8, 2023) ("Based on developing law, the Court finds that Ohio Rev. Code §§ 4101.11 and 4101.12 are too broad to constitute clear sources of public policy favoring workplace safety."). Other district courts have recognized §§ 4101.11 and 4101.12 as valid sources of public policy. *Jenkins v. Central Transp., Inc.*, 2010 WL 420027, at *3(N.D. Ohio Jan. 29, 2010); *see also Tarver v. Delta Tranz, LLC*, No. 1:17-CV-01963, 2018 WL 1638644, at *2 (N.D. Ohio Apr. 5, 2018).

This Court has addressed the split and expressly rejected *Whitaker* as "flat-out wrongly decided." *Lightner v. CB&I Constructors, Inc.*, No. 14-CV-2087, 2016 WL 6693548, at *9 n.6, *10 (S.D. Ohio Nov. 14, 2016). In doing so, this Court noted that *Pytlinski* remained controlling and that §§ 4101.11 and 4101.12 could satisfy the clarity requirement. *Id.* at *9 n.6, *10. In *Lightner*, however, the parties did not dispute that the plaintiff met the clarity element to support the claim when the plaintiff raised safety concerns tied directly to the physical workplace. *Id.* at *7. The plaintiff worked on landfill projects which required regular monitoring, and "[i]f not properly vented, they accumulate gas and can create hazardous, sometimes explosive, conditions." There, the plaintiff raised several concerns, including about unsafe dump truck operations, and exposure to gaseous, hazardous conditions. *Id.* at *1, *2.

This context is significant. Courts that have found §§ 4101.11 and 4101.12 as supporting a public policy claim have generally done so where the alleged misconduct involved physical workplace or premises safety. *See, e.g.*, *Heigel v. MetroHealth Sys.*, 2024-Ohio-1471, ¶ 39, 241 N.E.3d 380, 390 (finding public policy claim failed where the plaintiff did not allege any unsafe

15

premises or latent hazard); *Galyean v. Greenwell*, No. 05CA11, 2007 WL 453273, at *14 (Ohio Ct. App. Jan. 29, 2007) (noting that § 4101.11 addresses "traditional premises liability").

In *Jenkins* and *Tarver*, for example, the plaintiffs reported mechanical failures or unsafe conditions involving workplace vehicles, which implicated workplace safety. *Jenkins*, 2010 WL 420027, at *1; *Tarver*, 2018 WL 1638644, at *2. Similarly, in *Lightner*, the plaintiff's complaints related to safety concerns on a hazardous worksite. 2016 WL 6693548, at *1-*2. In each of these cases, the danger alleged stemmed from the physical condition of the workplace.

In contrast, Plaintiff's allegations here do not involve unsafe premises, equipment, or any physical hazard to employees or frequenters. Rather, her concerns relate to the quality of patient care and documentation, not the safety of the physical work environment. Plaintiff does not allege that any patients were placed in physical danger because of unsafe conditions on PPGOH's premises, nor that the condition of the premises is subject to §§ 4101.11 or 4101.12.

While this Court continues to reject the argument that §§ 4101.11 and 4101.12 are categorically too broad to support a public policy claim, a plaintiff must still "'identify a public policy concern that applies to the facts of the case.'" *Heigel*, 2024-Ohio-1471, ¶ 36, 241 N.E.3d 380 at 390 (quoting *Rowe v. Hoist & Crane Serv. Grp. Inc.*, 2022-Ohio-3130, ¶ 30). Because Plaintiff's allegations do not implicate physical workplace safety, she has not satisfied the clarity element of her wrongful discharge claim under Ohio law.

Accordingly, PPGOH's motion is granted as to the claim for wrongful termination in violation of public policy (Count XIII).

### IV. CONCLUSION

For the reasons discussed above, Defendant PPGOH's Motion to Dismiss (ECF No. 23) is **GRANTED in part and DENIED in part**. The motion is granted as to Plaintiff's claim for

wrongful termination in violation of public policy (Count XIII), and the motion is denied as to Plaintiff's ADA claims (Counts IV and IX). As such, Count XIII is **DISMISSED.**

      **IT IS SO ORDERED.**

                                              **ALGENON L. MARBLEY**
                                              **UNITED STATES DISTRICT JUDGE**

**DATED: September 17, 2025**